**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 4, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BOBBY ESPINOZA,

      Plaintiff - Appellant,

v.

DEPARTMENT OF CORRECTIONS,

      Defendant - Appellee.

No. 12-1009
(D.C. No. 1:10-CV-00548-CMA-KLM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, Chief Judge, **GORSUCH** and **MATHESON**, Circuit Judges.

---

In 2010, Bobby Espinoza sued the Colorado Department of Corrections ("DOC")

for retaliation under Title VII of the Civil Rights Act of 1964. The DOC moved for and

was granted summary judgment. Mr. Espinoza appeals.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

---

      * This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.    BACKGROUND

A. *Factual History*

Mr. Espinoza, who is Hispanic, was hired as a DOC correctional officer in 2004.

In April 2007, he was promoted to sergeant, a position also known as "Correctional

Officer II." This promotion was subject to a six-month trial period before Mr. Espinoza

would be certified as a sergeant. His position was located at the Colorado Territorial

Correctional Facility ("CTCF").

1. *Mr. Espinoza's Work Absence and Discipline*

On June 22, 2007, a few months into his trial period, Mr. Espinoza called a

superior and reported he would be unable to work his upcoming graveyard shift. His

absence was designated sick leave.[1] The following day was Mr. Espinoza's scheduled

day off.

Mr. Espinoza's supervisor, Captain Gary Moroney, who is white,[2] drafted a

"Performance Document" describing the effect of Mr. Espinoza's absence. The

Performance Document states that Mr. Espinoza's absence "caused the facility to drop

below minimum staffing" and required other officers to cover his shift. Appx. at 98. It

further states Mr. Espinoza had "two days off instead of one," that he "should be setting

---

[1] According to Mr. Espinoza, he was absent from work because his son was involved in a car accident.

[2] Mr. Espinoza believed that Capt. Moroney discriminated against him because he is Hispanic. We refer to Capt. Moroney and other non-Hispanic whites who were involved in this matter as "white."

positive accountability/organizational commitment examples," and that his absence "reflected a very bad example and sen[t] a very negative message to supervisors and subordinates alike about [his] leadership skills." *Id.*

2. *Meetings with Captain Moroney*

On June 27, 2007, Mr. Espinoza met with Capt. Moroney and discussed the Performance Document. The DOC asserts Mr. Espinoza grew angry at the meeting. Mr. Espinoza recalls that he was not angry and that Capt. Moroney became aggressive and verbally hostile.

Mr. Espinoza refused to sign the Performance Document. He also admits he told Capt. Moroney that the Performance Document was "chicken shit." *Id.* at 201. Capt. Moroney prepared a report recounting Mr. Espinoza's work absence, his "chicken shit" comment, and his refusal to sign the Performance Document.

On July 2, 2007, Mr. Espinoza again met with Capt. Moroney. Also present were Major Linda Maifeld, who is white, and Associate Warden Michel Arellano, who is Hispanic. Associate Warden Arellano began the meeting with introductory remarks and left. The parties dispute the tone of the rest of the meeting. But it is undisputed that while Capt. Moroney described his version of what happened at the June 27 meeting, Mr. Espinoza interrupted him, pointed his finger at him, and accused him of "lying through his teeth." *Id.* at 115.

The meeting ended abruptly, and Major Maifeld and Capt. Moroney escorted Mr. Espinoza from CTCF. While in the parking lot, Mr. Espinoza refused Major Maifeld's request to return to the building to complete paperwork.

### 3. *Allegation of Discrimination and Corrective Action*

The next day, July 3, 2007, Mr. Espinoza met with a union representative and Associate Warden Arellano. According to Mr. Espinoza, at this meeting he told Associate Warden Arellano that Capt. Moroney had discriminated against him on the basis of his race, and Associate Warden Arellano "acknowledged that cultural differences existed at CTCF." *Id.* at 255.[3] Mr. Espinoza's complaint of racial discrimination at this meeting forms the basis of his Title VII retaliation claim.

Almost two weeks later, on July 16, 2007, Mr. Espinoza was called to the office of Warden James Abbott, who is black. Warden Abbott issued Mr. Espinoza a written reprimand called a "Corrective Action." The document recounts Mr. Espinoza's "chicken shit" comment to Capt. Moroney on June 27 and his "extremely insubordinate" behavior during the meeting with Major Maifeld and Capt. Moroney on July 2. *Id.* at 127. It states these actions constituted "conduct unbecoming of an officer and disrespect

---

[3] According to Associate Warden Arellano, Mr. Espinoza never alleged racial discrimination at this meeting. Associate Warden Arellano recalls referring to "correctional cultures," not "cultural differences." Appx. at 371.

Nonetheless, in reviewing a grant of summary judgment, this court views the facts presented in the light most favorable to the nonmoving party, in this case Mr. Espinoza. *See Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1224 (10th Cir. 2012). For the purposes of this appeal, the DOC does not dispute that at the July 3, 2007 meeting, Mr. Espinoza complained that Capt. Moroney treated him differently because he is Hispanic.

towards [his] supervisors . . . in direct violation of [DOC regulation] AR 1450-1, Staff Code of Conduct." *Id.*

The Corrective Action required Mr. Espinoza to complete four tasks: submit a report to Capt. Moroney on the meaning and importance of DOC regulation AR 1450-1; attend training on professionalism and unlawful discrimination/sexual harassment; submit a report on a "Self Discipline and Emotional Control" video to Capt. Moroney; and submit a written apology to Capt. Moroney concerning his behavior at the June 27 and July 2 meetings. The Corrective Action warned that "[i]f this type of behavior happens again, there will be a Corrective or Disciplinary Action." *Id.*

B. *Procedural History*

1. *Investigation and Grievance Process*

On July 23, 2007, Mr. Espinoza filed a complaint with the DOC's Office of the Inspector General (the "OIG") that he had "been subjected to an abusive, hostile, demeaning and discriminatory work environment." *Id.* at 131. The OIG conducted a formal investigation into his allegations and completed an investigative summary ("OIG report").[4]

Between July 23 and November 2, 2007, Mr. Espinoza sought and obtained relief from the Corrective Action by filing grievances with DOC officials. Mr. Espinoza secured the following relief: removal of the Performance Document and the Corrective

---

[4] The record does not include the conclusions of the OIG report.

Action from his personnel file; a promise to "end . . . the abusive, retaliatory and hostile work environment if it occurred," *id.* at 151; and reinstatement of 184 hours of his leave time. As a result of the grievance process, he was never required to perform any of the tasks listed in the Corrective Action. Also during this period, Mr. Espinoza's promotion to sergeant was certified, and he was transferred to another facility at his request.

Prison officials denied Mr. Espinoza's requests for attorney fees and medical expenses incurred in grieving the Corrective Action, as well as reinstatement of all leave taken during the grievance process. Mr. Espinoza appealed the denial of the remaining requested relief to the Colorado State Personnel Board, which denied his petition for a hearing.

2. ***District Court***

After securing a right-to-sue letter from the Equal Employment Opportunity Commission, Mr. Espinoza sued the DOC in federal district court for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3. His complaint alleged that Warden Abbott issued the Corrective Action in retaliation for his complaint that Capt. Moroney had engaged in racial discrimination. Mr. Espinoza requested compensatory damages under 42 U.S.C. § 1981a, as well as costs and attorney fees.

The DOC successfully moved for summary judgment. The district court held that Mr. Espinoza had failed to establish two elements of a prima facie case of Title VII retaliation: (1) that he engaged in protected opposition to discrimination, and (2) that he

suffered an adverse employment action that a reasonable employee would have found material.

## II.   DISCUSSION

Mr. Espinoza challenges the district court's summary judgment dismissal of his Title VII retaliation claim.  We review the district court's grant of summary judgment de novo.  *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1222 (10th Cir. 2008).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ .P. 56(a).  "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way."  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (quotations omitted).  In reviewing the record, "[w]e view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party."  *Fye*, 516 F.3d at 1223.

### A. *Burden-Shifting Framework*

Mr. Espinoza agrees that, because he lacks direct evidence of retaliation, his claim is subject to the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Through this burden-shifting framework, Mr. Espinoza may indirectly prove that retaliation played a motivating part in the issuance of the Corrective Action.  *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011); *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008).

Under *McDonnell Douglas*, Mr. Espinoza first must present a prima facie case of

retaliation.  *See Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004).  This step requires him to show (1) he engaged in protected opposition to discrimination; (2) he suffered an action that a reasonable employee would have found materially adverse; and (3) there was a causal nexus between the opposition to discrimination and the adverse action.  *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006).  In this appeal, only the first two elements of a prima facie case of retaliation are at issue.

If Mr. Espinoza presents a prima facie case of retaliation, the burden shifts under the second *McDonnell Douglas* step to the DOC "to produce a legitimate, nondiscriminatory justification for taking the disputed employment action."  *Stover*, 382 F.3d at 1071.  Finally, if the DOC satisfies this burden, the burden shifts back to Mr. Espinoza to demonstrate that the DOC's asserted reasons for his discipline are a pretext for retaliation.  *See Fye*, 516 F.3d at 1227; *Stover*, 382 F.3d at 1071.

The district court used alternative grounds to grant the DOC's motion for summary judgment.  The court determined that Mr. Espinoza failed to make out either of the first two elements of a prima facie case of retaliation.  We may affirm the district court's ruling on any basis apparent in the record.  *See Seegmiller v. LaVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008).

As discussed below, we affirm the district court's determination that Mr. Espinoza failed to raise a genuine dispute of material fact regarding whether he engaged in protected opposition to discrimination.

B. *Protected Opposition to Discrimination*

1. *Reasonable Good-Faith Belief Standard*

Title 42 U.S.C. § 2000e-3(a) prohibits an employer from retaliating against an employee because the employee "opposed any practice made an unlawful employment practice by [Title VII]." Thus, the threshold element of a prima facie case of retaliation requires the employee to show he opposed a perceived violation of Title VII, such as employer discrimination. *See Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181 (10th Cir. 2006). An employee's "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

To demonstrate protected opposition to discrimination, the employee must show "he had a reasonable good-faith belief that the opposed behavior was discriminatory." *Id.* at 1016; *see Bd. of Cnty. Comm'rs v. E.E.O.C.*, 405 F.3d 840, 852 (10th Cir. 2005). This standard has subjective and objective components. *Little v. United Tech., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997); *see also Crumpacker v. Kan. Dep't of Human Res.*, 338 F.3d 1163, 1171 (10th Cir. 2003) (holding that a plaintiff cannot maintain a retaliation claim based on an "*unreasonable* subjective good-faith belief that the opposed conduct violated Title VII" (emphasis added)). "A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Little*, 103 F.3d at 960.

-9-

The reasonable good-faith belief standard "empowers employees to report what they reasonably believe is discriminatory conduct without fear of reprisal," *Bd. of Cnty. Comm'rs*, 405 F.3d at 852, and does not require that the plaintiff "convince the jury that his employer . . . actually discriminated against him," *Hertz*, 370 F.3d at 1015-16; *see also Crumpacker*, 338 F.3d at 1171 n.5 (10th Cir. 2003).  The employee's complaint of discrimination may constitute protected opposition even if it is mistaken, so long as the belief that discrimination occurred was objectively reasonable and made in good faith. *See Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir. 1984).

2.  ***Mr. Espinoza's Complaint of Discrimination***

It is undisputed for purposes of appeal that at the July 3, 2007 meeting, Mr. Espinoza complained to Associate Warden Arellano that Capt. Moroney discriminated against him because of his race.  We also assume without deciding that Mr. Espinoza presented evidence that he had a subjective—i.e., good-faith—belief that he experienced discrimination.[5]  The issue is whether Mr. Espinoza presented evidence that, when viewed in the light most favorable to him, indicates it was objectively reasonable for him to believe that Capt. Moroney discriminated against him on the basis of race.

Mr. Espinoza argues that he "had a multitude [of] data points" that led him to reasonably believe he experienced discrimination.  Aplt. Br. at 37.  These "data points" include the following:  (a) Capt. Moroney did not discipline white sergeants who

---

[5] The DOC in its brief concentrates on the objective reasonableness of Mr. Espinoza's belief that he experienced discrimination.

canceled their shifts; (b) he witnessed Capt. Moroney mistreat a black employee; (c) he heard rumors that Hispanic employees were segregated together in one CTCF cell house; and (d) Associate Warden Arellano was unsurprised by his complaint of discrimination and said "cultural differences existed at CTCF," Appx. at 255. In addressing these four arguments, we are mindful that "[a]lthough our review of the record is de novo, we conduct that review from the perspective of the district court at the time it made its [summary judgment] ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Fye*, 516 F.3d at 1223 (quotations omitted).

### a. *Different Treatment of White Sergeants*

Mr. Espinoza first argues that he had an objectively reasonable belief that he experienced discrimination because two white sergeants had "called off" work without being disciplined, whereas he was disciplined for calling in to miss work. Aplt. Br. at 28.

In the district court, Mr. Espinoza cited only to his affidavit to support his belief that the other sergeants had been treated differently. He averred, "I believed that Capt. Moroney discriminated against me because I was Hispanic because I was singled out for calling off when I knew of other non-Hispanic employees [who] had called in to cancel their shift without problems." Appx. at 255.

The DOC responded by citing to Mr. Espinoza's deposition testimony. He testified that he "had to cover for two [white] sergeants that called off [one] day." Appx. at 359. When asked whether he knew the reason the sergeants called off, Mr. Espinoza

-11-

responded, "No, sir, I don't." *Id.* at 360. When asked if he knew whether the sergeants had scheduled their leave in advance, he responded, "No, sir." *Id.* He then was asked whether he had "any reason to believe that [their absences were not] scheduled ahead of time." *Id.* He replied, "I don't know." *Id.* This was the entirety of the information about the sergeants that the parties presented to the district court.

The question is whether this evidence raises a genuine dispute of material fact about whether Mr. Espinoza had an objectively reasonable belief that the white sergeants were treated differently from him on the basis of race. To form such a belief, Mr. Espinoza would have had to know something about whether the sergeants' absences were similar to his. Mr. Espinoza argues the sergeants' absences were similar to his because (i) he and the sergeants called off work; (ii) at least one sergeant took leave in conjunction with a scheduled day off, as Mr. Espinoza did; and (iii) all their absences required others to cover their shifts. We address these points in turn.

### i. *Calling Off Work*

Mr. Espinoza's affidavit suggests that his absence was similar to the other sergeants' absences because they also called off work. But Mr. Espinoza testified he did not know whether the sergeants had scheduled their leave in advance. Thus, he did not know whether they actually called off—i.e., notified CTCF of their absences shortly before a scheduled shift—as he had done. Mr. Espinoza only knew the other sergeants were absent from work.

Accordingly, Mr. Espinoza provided the district court with no evidence supporting

-12-

an objectively reasonable belief that the other sergeants also called off work.

### ii. *Leave in Conjunction with Scheduled Time Off*

Mr. Espinoza next argues that he reasonably believed he was treated differently from the white sergeants because at least one sergeant took leave in conjunction with scheduled days off and was not disciplined. In contrast, the Performance Document states Mr. Espinoza was disciplined for calling off on a day preceding his scheduled day off.

To support this argument, Mr. Espinoza relies on the OIG report's finding that one of the sergeants took leave in conjunction with scheduled days off. But Mr. Espinoza did not cite to the OIG report in opposing the DOC's motion for summary judgment. Our review is constrained to the evidence adequately brought to the attention of the district court. *Fye*, 516 F.3d at 1223.

Even if we could consider the OIG report, it reveals that one of the sergeants *was not absent* during the time Mr. Espinoza alleged and that the other sergeant had *prescheduled sick leave* in conjunction with scheduled days off to undergo a medical procedure. Rather than bolster Mr. Espinoza's argument that he reasonably believed the sergeants' absences were similar to his, the OIG report undermines his claim.

### iii. *Covering Shifts*

Finally, Mr. Espinoza argues that the sergeants' absences were similar to his because each absence required others to cover the shift. He testified that on June 27, 2007, he "had to work in a different cellhouse because [he] had to cover for [the] two

-13-

sergeants." Appx. at 359. Although the sergeants were not disciplined, the Performance Document states Mr. Espinoza was disciplined because his absence "caused the facility to drop below minimum staffing" and required two officers to cover his graveyard shift. *Id.* at 98.

Mr. Espinoza's argument is not persuasive because his absence required a different form of "covering" than did the other sergeants' absences. According to the Performance Document, "[a] Swing Shift officer had to remain on duty until 0200 hours and a Day Shift officer had to report for duty at 0200 to cover the shortage created by [Mr. Espinoza's] call off." *Id.* In other words, his absence burdened other employees by requiring them to work parts of a graveyard shift when they otherwise would be off. In contrast, Mr. Espinoza's testimony indicates that he had to "work in a different cellhouse" to cover for the sergeants, not that he had to report to work when he otherwise would not have to. *Id.* at 359. He presented no evidence that the sergeants' absences caused him or any other employee to remain on duty longer or report to duty earlier.

\* \* \*

We do not suggest that Mr. Espinoza needed to know every detail about the white sergeants' alleged absences before he could make a reasonable complaint of discrimination. But he needed to know at least *some facts* that would support an objectively reasonable belief that their absences were similar to his. *See Little*, 103 F.3d at 960 (holding that a plaintiff must show "his belief was *objectively* reasonable in light of the facts and record presented"). Such relevant facts could include the reason for their

-14-

absences; whether their absences were prescheduled or sudden; whether they used sick leave or some other form of leave; the timing of the absences in conjunction with scheduled time off; and the type of shift (daytime, evening, or graveyard) for which they were absent. Mr. Espinoza provided no evidence to the district court that he based his discrimination allegation on any of these pertinent facts. In other words, a reasonable allegation requires a reasonable factual basis, and Mr. Espinoza did not have one.

Accordingly, we agree with the district court that Mr. Espinoza's evidence regarding the white sergeants is insufficient to support an objectively reasonable belief that Capt. Moroney discriminated against him.

b. ***Treatment of a Black Employee***

Mr. Espinoza also argues that he reasonably believed he experienced discrimination because he had previously witnessed Capt. Moroney mistreat a black employee who expressed belief that the mistreatment was racially motivated.

In the district court, Mr. Espinoza cited to his affidavit and deposition testimony to support this argument. His affidavit states that he "observed Capt. Moroney treat a person who was non-Caucasian poorly, and that person told [him] he believed he was being treated differently because he was non-Caucasian." Appx. at 255.

Mr. Espinoza described the incident as follows in his deposition:

> I heard [Capt. Moroney] telling – it was something to the point [about] what the guy had done. And Moroney turned around and told him, he said: I'll kick your ass. Don't let this bum hip fool you; I can still kick some ass.
> The guy was like kind of stumbling all over himself. And Moroney

said: Just get back over and do what you're supposed to do, or something like that, and walked away from the guy.

I'm not sure what the whole thing was about.

*Id.* at 247.

The employee, whose name Mr. Espinoza did not know, later asked him "if [Mr. Espinoza] thought . . . the union could help him." *Id.* Mr. Espinoza "told him he needed to go talk to them himself; [Mr. Espinoza] didn't know if they could or not. And it was pretty much left at that." *Id.* When asked whether Mr. Espinoza perceived that Capt. Moroney mistreated the employee because of his race, he responded:

Well, yeah, because after the [black employee] came and talked to me, . . . that's pretty much what he insinuated to me . . . .

So that's why I come to that [conclusion]. I saw what I saw, and I kind of felt it. And then [the employee] coming to me kind of, you know, verified it to me.

. . .

[The employee] said he felt it was [because of race]. He said it wasn't the first time that [he] and Moroney had issues. But I never did ask him, you know, to get into it.

*Id.* at 248.

We have no reason to doubt that Mr. Espinoza had a subjective good-faith belief that Capt. Moroney mistreated this employee on the basis of his race. But we must determine whether Mr. Espinoza presented facts showing it was objectively reasonable for him to draw this conclusion and further that it was objectively reasonable for him to conclude that Capt. Moroney also discriminated against Mr. Espinoza. His testimony suggests that his belief was based on (i) what he observed in Capt. Moroney's treatment of the black employee, and (ii) what the employee later told him.

-16-

### i.     *Mr. Espinoza's Observations*

Mr. Espinoza witnessed Capt. Moroney yell threats and profanity for something the black employee "had done" and ordered the employee to "do what [he was] supposed to do." *Id.* at 247. Although it might be unusual that Capt. Moroney treated a subordinate in this manner, Mr. Espinoza has provided no indication that Capt. Moroney's conduct was out of the ordinary for him or other superior officers at CTCF. And although Title VII prohibits racial discrimination, it "does not set forth a general civility code for the American workplace." *Burlington N. Santa Fe Ry. Co.*, 548 U.S. at 68 (quotations omitted). An employer's "rude and unfair conduct" and profanity do not alone violate Title VII. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002); *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (11th Cir. 2007).

Mr. Espinoza's testimony suggests Capt. Moroney grew verbally aggressive for something the black employee "had done" and told the employee to do what he was supposed to be doing. *Id.* at 247. Mr. Espinoza admits he was "not sure what the whole thing was about," *id.*, but just "kind of felt" discrimination had occurred, *id.* at 248. His description of this incident provides no facts from which to conclude it was objectively reasonable to believe that Capt. Moroney mistreated this employee because of his race.

### ii.     *Black Employee's Statements to Mr. Espinoza*

Mr. Espinoza notes that the black employee either "insinuated" or expressly stated to him that Capt. Moroney's actions toward the employee were racially motivated. *Id.* The employee also told Mr. Espinoza that he and Capt. Moroney previously "had issues,"

but Mr. Espinoza did not ask for further details. *Id.*

The employee's statement or insinuation was his opinion, and we can assume it was sincere. But this opinion at most could help form Mr. Espinoza's *subjective good-faith belief* that the employee and he both suffered discrimination; it could not form the basis of an *objectively reasonable belief* that discrimination has occurred. It was unreasonable for Mr. Espinoza to assume Capt. Moroney discriminated against him because another employee expressed an opinion, unsupported by facts, that he suffered discrimination by Capt. Moroney. Mr. Espinoza admits he "never did ask" the employee to describe previous encounters with Capt. Moroney, *id.*, which could have led to facts— not subjective opinions and feelings—supporting Mr. Espinoza's belief that he too experienced discrimination.

On appeal, Mr. Espinoza also points us to the OIG report, which states that a different employee "told Sergeant Espinoza he felt having been pulled off of a training class by Moroney without an explanation may have been [due to] prejudice." *Id.* at 143. This employee "agreed [Mr.] Espinoza might have believed [the employee] felt Moroney might have been a little prejudice [sic]." *Id.*

Mr. Espinoza did not cite this evidence to the district court. We will not disturb the district court's ruling based on evidence Mr. Espinoza did not properly present to it. Even if we were to consider this evidence, it again would only support a subjective good-faith belief, not an objectively reasonable one, that Mr. Espinoza experienced discrimination. It was not objectively reasonable for Mr. Espinoza to base his allegation

-18-

of discrimination on another employee's subjective opinion that Capt. Moroney "might have been" prejudiced. *Id.*

Mr. Espinoza's attempt to rely on the opinions and feelings of other employees is also problematic in light of his reliance on his own feelings. In describing his July 2, 2007 meeting with Capt. Moroney and Major Maifeld, he testified he felt they "ganged up on" him, were "totally all against" him, and "didn't give [him] an opportunity to explain anything." *Id.* at 239. When asked what made him believe their conduct was based on his race, he replied, "I don't know. I just felt that it was." *Id.* When asked whether they had given him any indication that their actions were based on his race, he responded, "No." *Id.*

c. ***Rumors or Statements of Segregation***

Mr. Espinoza briefly asserts on appeal that he was "aware of rumors or statements that Hispanic employees at CTCF were segregated together in one cell house." Aplt. Br. at 15. The district court said these rumors could not form the basis of Mr. Espinoza's belief that he experienced discrimination because the rumors were "contrary to his own experience, which he said included being assigned to a cell house with both Hispanic and non-Hispanic employees." Appx. at 389.

We agree with the district court's reasoning. It was not objectively reasonable for Mr. Espinoza to believe he experienced discrimination because he had heard rumors about discriminatory work assignments, especially when the rumors were counter to his own experience. Mr. Espinoza could not recall where he heard the rumors; did not know

-19-

who allegedly was segregating Hispanic employees, let alone Capt. Moroney; and testified that, contrary to the rumors, he worked with non-Hispanics in his cell house, including white employees.

### d. *Associate Warden Arellano's "Cultural Differences" Comment*

Finally, Mr. Espinoza argues that when he complained of discrimination, "Associate Warden Arellano did not dispute the claim that racial or national origin discrimination had occurred," but instead "acknowledged that cultural differences existed at CTCF and indicated that they were working on this situation." Aplt. Br. at 15.

The first problem with this argument is timing. Associate Warden Arellano's comment could not have helped Mr. Espinoza form an objectively reasonable belief that he was opposing discrimination. Mr. Espinoza himself acknowledges that Associate Warden Arellano made this comment *after* Mr. Espinoza complained of discrimination. Thus, Associate Warden Arellano's comment that there were cultural differences at CTCF could not have been part of Mr. Espinoza's determination that he experienced discrimination.

Even if the comment were relevant to the issue at hand, Mr. Espinoza did not present evidence on what Associate Warden Arellano meant by this statement, develop a factual record to demonstrate what the differences were, or explain how this comment established a basis for his belief of discrimination in this instance. *See Little*, 103 F.3d at 960 (explaining that a plaintiff must show "his belief was *objectively* reasonable in light of the facts and record presented"). Mr. Espinoza offered the district court only his

-20-

unsupported belief that white sergeants were not disciplined for similar absences, opinions of other employees about discriminatory treatment, and rumors of segregation that were counter to his own experience.  This evidence is insufficient to show that his subjective belief that he experienced discrimination was also objectively reasonable.

*     *     *

Mr. Espinoza presented four bases to demonstrate that he reasonably believed Capt. Moroney discriminated against him.  We conclude that the evidence he presented to the district court, separately and in the aggregate, fails to raise a genuine dispute of material fact as to whether his belief was objectively reasonable.  He therefore has failed to establish the first element of a prima facie case of retaliation:  that he engaged in protected opposition to discrimination.

## III.    **CONCLUSION**

For the foregoing reasons, we affirm the district court's grant of the DOC's motion for summary judgment.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge